SMITH et al., Appellants,

v.

JUSTARR, INC., d.b.a. Terrace at Westside, Appellee.

[Cite as *Smith v. Justarr, Inc.* (1995), 102 Ohio App.3d 506.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–930776.

Decided April 12, 1995.

*Schwartz, Manes & Ruby, Harry S. Sudman* and *Donald B. Hordes,* for appellants.

*Droder & Miller Co., L.P.A., Bradley A. Powell* and *Edward J. Collins,* for appellee.

*Per Curiam.*

By statute in Ohio, the General Assembly has created standards to regulate how medicine is to be dispensed to the residents of rest homes. R.C. 3721.011. Included in those standards is a listing of what actions may appropriately be taken by a staff member such as a nurse aide in connection with the administration of medication. R.C. 3721.011(A)(1) through (3). In this appeal, we must determine whether a jury in the court of common pleas was properly instructed

on the meaning and application of the statute before it returned a verdict in favor of the operator of a rest home in an action in which two women formerly employed as nurse aides asserted that they had been wrongfully discharged for refusing to administer medication in violation of the statute. For the reasons that follow, we find no merit in the claims raised on appeal with respect to the jury instructions, and we, accordingly, affirm the judgment entered upon the jury's verdict.

The defendant-appellee, Justarr, Inc., is in the business of providing various levels of nursing and personal-care assistance to individuals who are unable to look after their own needs. Among other things, it has been involved over the years in the operation of a rest home known as the Terrace at Westside and an adjacent skilled nursing facility, or nursing home, known as Westside Health Care.[1] The rest home, which was opened in 1985, is permitted by law to provide accommodations to individuals who, for various reasons, are in need of supervision and personal care, but who do not yet require "skilled nursing care." R.C. 3721.01.

The plaintiffs-appellants, Theresa Smith and Mary Christine Whitt, were employed by the rest home as nurse aides near the beginning of 1991 without any guarantee of tenure. At that time, the home had approximately twenty-three residents and a capacity for almost twenty more. Most of the services regularly provided to the residents were performed by nurse aides, but to supplement the day-to-day care, the home also had on its staff at least one full-time licensed practical nurse; and in those extraordinary circumstances when a particular need arose, there were as well registered nurses on call to respond from the adjacent nursing home.

Following a brief period of orientation and training, Smith and Whitt were given a regimen of work for the residents that included general housekeeping tasks such as doing laundry and taking care of personal hygiene and grooming needs. Beyond this, however, it appears that the most important part of their daily routine was their involvement in the distribution of individual doses of medicine to each resident of the home, a practice that is repeatedly described in the trial record as "passing medicines."

According to the record, most if not all residents of the home were receiving in pill form medication prescribed by the attending physician under whose orders each resident had been admitted to the home. The home's practice, in general, was to account for and supply individual doses of medicine by the use of

---

1. There is some indication in the record that a separate corporation may have formally owned a majority interest in the nursing home, but that is not significant in our resolution of this appeal.

compartmentalized containers referred to at trial as "MediSets." The responsibility for keeping each MediSet appropriately stocked fell in the first instance to a licensed practical nurse or to a registered nurse. The MediSets were each labelled with an individual resident's name and then loaded on a wheeled cart, which was, in turn, routinely used by the nurse aides at regular intervals to distribute medicines to the residents. To get the appropriate individual doses of medicine to each resident, the nurse aides were expected ordinarily to wheel the medicine cart through the home, remove pills from compartments of the Medi-Sets, place the pills in paper cups and hand the cups to the residents as their names were called out individually.

Not long after Smith and Whitt began their work, a resident at the home raised to one of them a concern about the legality of the actual handling of medicine by nurse aides, apparently in the belief that only more skilled and better trained nurses should have been permitted to distribute medicine to residents. That expression of concern prompted both Smith and Whitt to make various inquiries outside the home about their involvement in the distribution of medicine, with each of them purportedly acting without any knowledge of what the other was doing in the way of investigation. One of the contacts made was reported to have involved a long-distance telephone call to the Ohio Department of Health in Columbus, Ohio, during which a representative of the department stated that nurse aides were categorically forbidden by Ohio law to handle medicine regardless, for example, of the particular mental and physical capabilities of any rest-home resident for whom they might otherwise have been providing care.

After personally becoming satisfied that they were, as a condition of their employment, being called upon to handle medicine unlawfully, Smith and Whitt each went to the home's administrator and informed him that they would no longer participate in any way in the distribution of medicine to the residents. The administrator discharged them when they refused to retreat from their expressed unwillingness to perform what he considered to be a vital function of nurse aides, even in the face of his assurances that the home's practices with respect to the distribution of medicine were fully in compliance with law.

The claim for relief pursued by Smith and Whitt in the court of common pleas was predicated upon the limited theory of wrongful discharge recognized in Ohio for at-will employees whose loss of work has been proximately caused by their employer's violation of public policy. See *Painter v. Graley* (1994), 70 Ohio St.3d 377, 639 N.E.2d 51; *Greeley v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981. The specific public policy upon which they relied, and which now frames the dispute between the parties on appeal, is codified in R.C. 3721.011(A), which addresses who may be admitted as a resident

to a rest home, how medication may generally be administered to a resident, and what a staff member such as a nurse aide may do to assist a resident in the administration of medication:

"A rest home may * * * provide for the administration of medication to residents in accordance with division (B) of this section.[2]  All medication taken by residents of rest homes shall be self-administered, and members of the staff of a rest home shall not administer medication to residents, except that medication may be administered in accordance with division (B) of this section * * *.  No person shall be admitted to or retained by a rest home unless the person is capable of taking his own medication and biologicals, as determined in writing by the person's personal physician, except that a person may be admitted to or retained by a rest home if the home provides for the administration of medication in accordance with division (B) of this section * * *.  Members of the staff of a rest home may do any of the following:

"(1) Remind a resident when to take medication and watch to ensure that the resident follows the directions on the container;

"(2) Assist a resident in the self-administration of medication by taking the medication from the locked area where it is stored, in accordance with rules adopted pursuant to section 3721.04 of the Revised Code, and handing it to the resident.  If the resident is physically unable to open the container, a staff member may open the container for the resident;

"(3) Assist a physically impaired but mentally alert resident, such as a resident with arthritis, cerebral palsy, or Parkinson's disease, in removing oral or topical medication from containers and in consuming or applying the medication, upon request by or with the consent of the resident.  If a resident is physically unable to place a dose of medicine to his mouth without spilling it, a staff member may place the dose in a container and place the container to the mouth of the resident."

When the time came in the proceedings below to submit for the jury's resolution the claim of wrongful discharge, a disagreement arose with respect to the meaning and application of the statute in relation to what it permitted nurse aides such as Smith and Whitt to do in the day-to-day settings in which they worked.  Over the objection of counsel for the two women, the trial judge elected to paraphrase the material terms of the statute without employing any interpretive gloss, and to focus in particular on the listing of duties that could, in the eyes of the law, appropriately be delegated to staff members such as nurse aides.  In so doing, the judge refused to give the jury the following proposed instruction:

---

**2.**  The import of division (B) is its recognition that such licensed professionals as doctors, registered nurses, and licensed practical nurses are competent to administer medication.

"[R.C.] 3721.011 provides that residents of a rest home like defendant can be given medicines, or aided in the taking of their medicines, by nurse aid[e]s, only if the resident's personal physician has previously placed in his/her file a written statement that the resident is capable of taking or participating in the taking of his or her own medicine.

"[R.C.] 3721.011 further provides that if the statement from the resident's personal physician that the resident is capable of taking his or her own medicine or participating in the taking of their own medicine is not in the resident's file, only a registered nurse, licensed practical nurse, or physician, can administer medicines to the resident.

"Thus, it is unlawful for nurse aides such as plaintiffs to administer medicines, or to assist in the self-administration of medicines to a resident who lacks a statement from his/her personal physician in his/her file that th[e] resident is capable of taking, or participating in the taking of his/her own medicine."

At the conclusion of its deliberations, the jury returned a general verdict against Smith and Whitt, supplemented by a specific finding, in response to a series of special interrogatories, that the two women had failed to prove that the Terrace at Westside had engaged in any violations of R.C. 3721.011(A).

In the only assignment of error given to us for review, Smith and Whitt now contend that the trial judge erred both by refusing to give the jury their requested instruction on how to interpret R.C. 3721.011(A) and by choosing instead to instruct on the terms of the statute without the amplification necessary to allow the jury to give the statute its appropriate meaning and significance. The fundamental proposition upon which both aspects of their argument depend is that there are ambiguities in the material terms of the statute, and that such ambiguities should have given rise, in the context of this case, to a duty on the part of the trial judge to interpret for the jury under what circumstances the General Assembly intended to allow nurse aides in rest homes to participate in the distribution or "passing" of medicine to residents. Although Smith and Whitt are unquestionably asserting that judicial interpretation was necessary below to ensure a meaningful determination about whether the work assigned to nurse aides at the Terrace at Westside amounted to a violation of law, we note that the two women specifically concede in advancing their assignment of error that the instruction actually given by the trial judge was legally "correct." The thrust of their complaints on appeal may, therefore, be distilled to the claim that the actual instruction given to the jury, while not erroneous *per se,* was incomplete to the extent that it lacked an interpretive gloss for R.C. 3721.011(A), and that such incompleteness prejudicially gave rise to potential confusion in the jury's resolution of the case.

In Ohio, the general standard governing the trial court's duty to instruct the jury in a civil action is set forth in the body of the decision in *Marshall v. Gibson* (1985), 19 Ohio St.3d 10, 12, 19 OBR 8, 10, 482 N.E.2d 583, 585, which provides that the jury must be given "a plain, distinct and unambiguous statement of the law as applicable to the case" in the context of the evidence adduced by the parties. Where, as here, the body of applicable law includes a statutory enactment, the trial court should ordinarily focus upon the actual language used in the statute, but if the statute contains words or phrases of doubtful or ambiguous meaning, the instructions should include, particularly if duly requested, an explanation calculated to prevent the jury from being misled or confused about how to apply the statute to the evidence presented in the case. *Wolfe v. Baskin* (1940), 137 Ohio St. 284, 18 O.O. 45, 28 N.E.2d 629; *Simko v. Miller* (1938), 133 Ohio St. 345, 10 O.O. 535, 13 N.E.2d 914. In responding to a party's request for elaboration of the meaning of a statute, the court should first determine whether the request is founded upon a material ambiguity, and when that is the case, it should proceed to give the requested instruction only if the request correctly states the law, is pertinent to a material issue in dispute, and does not repeat what has already been included in the charge. See *Briere v. Lathrop Co.* (1970), 22 Ohio St.2d 166, 51 O.O.2d 232, 258 N.E.2d 597; *Centrello v. Basky* (1955), 164 Ohio St. 41, 57 O.O. 77, 128 N.E.2d 80, paragraphs five and six of the syllabus.

In the case *sub judice*, Smith and Whitt argue that R.C. 3721.011(A) is materially ambiguous in respect to what the General Assembly intended to be the foundational requirement for allowing nurse aides in rest homes to participate in the distribution of medicine in the ways specifically outlined in subdivisions (A)(1) through (A)(3) of the statute. In their view, that ambiguity was not properly interpreted as a matter of law in the instruction actually given to the jury, and was only resolved in their requested instruction, which, by its terms, unconditionally made any involvement in the handling of a resident's medicine by a nurse aide unlawful unless the rest home maintained on file for that resident an explicit written determination by a physician that the resident was capable of taking his or her own medication. We are not persuaded for the following reasons either that the statute is ambiguous in the manner asserted by Smith and Whitt, or that their requested instruction was otherwise appropriate in the context of this case.

In our judgment, the terms of R.C. 3721.011(A) make plain that while there is a foundational requirement for the participation of nurse aides in the distribution of medicine under subdivisions (A)(1) through (A)(3), the requirement is not the one urged by Smith and Whitt. When division (A) is read in its entirety and all the terms are given their commonly understood meanings, it is clear that the legal threshold for the involvement of a nurse aide in a given resident's medicine is the

ability in fact of the resident to self-administer medicine, not the express determination of a physician with respect to ability or how that determination may be preserved in a formal record. This is so, *inter alia,* because the statute explicitly ties a physician's written determination on self-administration, without any particular recordkeeping requirement, only to a resident's admission to or retention in a rest home ("No person shall be admitted * * * or retained * * * unless * * * capable of taking his own medication * * * as determined in writing by the person's personal physician"); and because the admission or retention requirement is explicitly inapplicable whenever a home has either a registered nurse, a licensed practical nurse, or a physician available to administer medicine ("except that a person may be admitted to or retained by a rest home if the home provides for the administration of medication in accordance with division [B] of this section").

We hold, therefore, that the instruction proposed by Smith and Whitt was legally incorrect in two respects: (1) it was predicated upon a statutory ambiguity that did not exist; and (2) the significance it gave to the recording of a physician's determination on self-administration of medicine was contrary to the plain meaning of R.C. 3721.011(A). Accordingly, it cannot be said that the trial court erred in refusing to give the requested instruction or in otherwise failing to provide the jury with an interpretive gloss on the foundational statutory requirement for involving nurse aides in the distribution of medicine.

Beyond this, we note that the state of the evidence adduced at trial had a distinct impact on the extent to which the jury needed to be instructed on the meaning and application of R.C. 3721.011(A). According to the record, it was undisputed below that the Terrace at Westside had at least one full-time licensed practical nurse on its staff to care for the residents, and that it had additional access to the registered nurses who worked at the adjacent nursing home. Under these circumstances, it appears that whatever R.C. 3721.011(A) may have required in the abstract with respect to a physician's assessment of a resident's ability to self-administer medicine was absolutely irrelevant to the parties' dispute on its facts, because the home had the appropriate means to have professionals administer medicine in accordance with R.C. 3721.011(B).

It is further clear on the facts that the absence of a physician's determination about self-administration had absolutely no bearing on the series of events that culminated in the discharge of Smith and Whitt. This, too, made the subject of a physician's determination irrelevant to the jury's resolution of the case.

Insofar as there were material conflicts in the evidence presented at trial, those conflicts sharply limited the jury's factfinding role to two primary issues: (1) whether Smith and Whitt were called upon to participate in the distribution of medicine to specific individuals who were, in fact, incapable of self-administering

medicine; and (2) whether, in specific instances, their involvement went beyond the permissible activities outlined in R.C. 3721.011(A)(1) through (A)(3). Given the focus provided by the trial record, we are persuaded not only that the requested instruction was properly rejected because it was not appropriately tailored to these issues, but also that the instruction actually given fully equipped the jury to resolve the claim of wrongful discharge fairly and without confusion. For all the foregoing reasons, the assignment of error given to us by Smith and Whitt is without merit.

All that remains for us to consider are the two assignments of error that are contained in the appellee's brief filed by Justarr, Inc. Because the substance of those assignments concerns issues that are designed to prevent a reversal of the judgment entered below in Justarr's favor, they need not be addressed on the merits in view of our determination that there is no merit in the only assignment of error advanced by Smith and Whitt. See R.C. 2505.22.

The judgment of the court of common pleas is hereby affirmed.

*Judgment affirmed.*

HILDEBRANDT, P.J., DOAN and M.B. BETTMAN, JJ., concur.